NEW ORLEANS STEVEDORING
COMPANY, Petitioner,

v.

FEDERAL MARITIME COMMISSION
and United States of America,
Respondents.

No. 02–1259.

United States Court of Appeals,
District of Columbia Circuit.

Sept. 29, 2003.

Rehearing Denied Nov. 20, 2003.

Before EDWARDS, ROGERS and GARLAND, Circuit Judges.

## JUDGMENT

PER CURIAM.

This case was heard on the petition for review of an order of the Federal Maritime Commission. For the reasons set forth in the accompanying memorandum opinion, it is

ORDERED AND ADJUDGED that the petition for review is hereby denied.

Pursuant to D.C. Circuit Rule 36, this disposition will not be published. The Clerk is directed to withhold issuance of the mandate herein until seven days after resolution of any timely petition for re-hearing or rehearing en banc. *See* Fed. R.App. P. 41(b); D.C.Cir. Rule 41.

## MEMORANDUM OPINION

The Shipping Act of 1984, 46 App. U.S.C. § 1709, prohibits marine terminal operators from "unreasonably refus[ing] to deal or negotiate," (§§ 10(b)(10), (d)(3)), and from giving "any undue or unreasonable preference or advantage or impose any undue or unreasonable prejudice or disadvantage with respect to any person" (§ 10(d)(4)). New Orleans Stevedoring Company ("NOS") contends that the Federal Maritime Commission ("FMC") dismissed (1) a refusal to deal claim without considering the contemporaneous reason given by the Port of New Orleans ("Port") or NOS's specific allegations, and without following its precedent; (2) an undue prejudice and preference claim without analyzing the Port's justification under FMC's established principles; and (3) a claim that denial of NOS's berth and cargo applications violated its tariff and §§ 10(b)(10), (d)(3). Upon review of the record, we hold that the FMC's findings are supported by substantial evidence, *see Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 618–20, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966), and that its decision is consistent with its precedent.

## I.

Refusal to deal, §§ 10(b)(10) & (d)(3). As a preliminary matter, NOS's attack on the level of detail in the FMC's analysis fails because: (1) the FMC could properly incorporate by reference the Administrative Law Judge's ("ALJ") decision, which contains factual findings and analysis of the relevant issues; and (2) the FMC's analysis exceeds the detail required. *See Puerto Rico Mar. Shipping Auth. v. Fed. Mar. Comm'n*, 678 F.2d 327, 351 (D.C.Cir. 1982).

There is substantial evidence to support the FMC's finding that the Port's reason for refusing to lease its Napoleon facility was based on its general policy against assignment of the facility during reconstruction. NOS focuses on an October 11, 1999 letter in which the Port re-

ferred to "lack of capacity." It argues that this, rather than "interference with construction," was the Port's contemporaneous reason and that precedent required the FMC to hold the Port to this reason. *See Ceres Marine Terminal, Inc. v. Maryland Port Admin.*, 27 S.R.R. 1251, 1272 (FMC 1997). Even assuming NOS's reading of the October letter is accurate, the record includes communications between the parties that refer to construction as the Port's primary reason, including: (1) the Port's announced policy that it would not assign or lease Napoleon due to impending construction; and (2) NOS's October 12, 1999 letter to the Port, summarizing an October 11, 1999 meeting and referring to the Port's refusal to lease Napoleon due to interference with planned construction. Contrary to NOS's view, the evidence does not show that the Port sought to remove NOS from the New Orleans market: NOS was permitted to remain at Napoleon until construction began, was offered a lease at the only non-leased Port facility at the time, and had opportunities at numerous meetings with Port officials to commit to a long term solution. Moreover, in maintaining that the Port refused to deal with NOS in order to steer business to a more favored Port client, NOS takes a statement in the Port's September 23, 1999 letter out of context. In context, the Port's "surprise" relates to the Mediterranean Shipping Company's ("MSC") attempt to circumvent the Port's no-lease decision and to contract with a non-lease holder.

The FMC's decision in favor of the Port is consistent with its precedent. Although a harsh result for NOS, under FMC precedent, the Port's business judgment is entitled to deference. *See, e.g., Ceres,* 27 S.R.R. at 1274. Unlike the port in *Canaveral Port Authority—Possible Violations of Section 10(b)(10), Unreasonable Refusal to Deal or Negotiate,* 29 S.R.R. 484, 485

(FCM2002), which initially gave no reason for its action, the Port considered NOS's lease proposal and rejected it because of an impending construction project. As in *Seacon Terminals, Inc. v. Port of Seattle,* 26 S.R.R. 886, 889 (FCM1993), where non-renewal of a lease permitted the port to negotiate the lease with other operators, once NOS declined to renew its lease, the Port was free to decide not to lease Napoleon pending construction. The FMC found this explanation to be reasonable, particularly in light of the Port's experience with construction projects. NOS's reliance on *Petition of South Carolina State Ports Authority for Declaratory Order,* 27 S.R.R. 1137, 1161 (FCM1997), is to no avail for even if the Port's general, nondiscriminatory policy of not leasing Napoleon during construction was a "restrictive practice" for these purposes, and even if this policy was the proximate cause of the market concentration alleged by NOS, the FMC found on the basis of substantial evidence that the policy was reasonable under the circumstances. The fact that the FMC did not directly address the competitive effects of the Port's policy is therefore irrelevant.

### II.

■ Unreasonable preference, § 10(d)(4). It was reasonable for the Port to give preference to lessees whose operations in their leaseholds had been disrupted by Port construction projects, and to whom the Port had some obligation to mitigate. The Port did not distinguish NOS based on its status or identity as a shipper, as NOS and the two lessees were all terminal operators. *See Co–Loading Practices by NVOCCs,* 23 S.R.R. 123, 132 (FCM1985); *Ceres,* 27 S.R.R. at 1272. Rather, the Port stated it wanted to maintain long-term relationships with these lessees and avoid breach of contract liability.

As the ALJ concluded, "[i]t cannot seriously be maintained that such a motive is not related to transportation concerns." The FMC's decision is not inconsistent with *Ceres* or *Co–Loading Practices* as these two decisions were context-specific and do not bear on the question of preferential treatment of lessees. Here, the FMC reasonably found that lessee status was related to valid transportation concerns because of the lessees' "greater commitment to the Port," (through minimum cargo throughput guarantees and assumption of fixed costs) and that this justified preferential treatment under the specific circumstances.

### III.

■ Finally, the FMC properly ruled that the Port's decisions not to permit NOS to use Napoleon, the Foreign Trade Zone ("FTZ"), or the "grassy area," or to approve certain berth applications were reasonable and did not violate its tariff. NOS's reliance on Items 308, 310, and 312 of the Port's tariff are unpersuasive for reasons stated by the ALJ. Item 312, for example, gives discretion to the Port in determining whether space is available and how it is to be classified. There is substantial evidence to support the Port's decisions on availability: Napoleon was under construction, the FTZ's use was limited to customs-free storage, and the grassy area required improvements that NOS failed to undertake or commit to undertake and was subject to a long-term lease on 90 days notice. Although there may have been unused space or space that could have accommodated NOS and others, the Port was entitled, as the ALJ found and the FMC affirmed, to adhere to its policy of reserving space for lessees who might be affected by construction. Moreover, the record includes correspondence between NOS and the Port that shows that NOS was encouraged to devel-op a long-term solution by either leasing another terminal or improving the grassy area, and that NOS failed adequately and timely to respond.